GEORGE F. CUDDY *vs.* L AND M EQUIPMENT Co. & others.

Middlesex.    March 7, 1967. — April 28, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Evidence,* Relevancy and materiality, Of life expectancy, Hearsay, Interrogatories, General objection to admission of evidence. *Practice, Civil,* Argument by counsel. *Damages,* For personal injuries. *Negligence,* Motor vehicle.

Where there was medical testimony in an action for personal injuries that due thereto the plaintiff probably would have physical difficulty and pain permanently, evidence to show his life expectancy was relevant and admissible, even though his earning capacity was not impaired. [461–462]

In an action for personal injuries arising from a collision of the defendant's motor vehicle with the rear of an automobile in which the plaintiff was riding, an answer of the defendant to an interrogatory, that he "felt that . . . [his motor vehicle] did not stop as well as it should, and sometime afterwards the brakes were found to be faulty and were relined," did not embody hearsay and was not rendered inadmissible on that ground. [462–463]

An exception to the admission of a certain answer to an interrogatory in an action was not to be sustained where at least part of the answer was admissible and the objection to its admission was general. [463]

In an action for personal injuries where, although there was no evidence of impairment of earning capacity, there was medical testimony that due to the injuries the plaintiff would probably have physical difficulty and pain permanently and the judge charged the jury correctly that only the evidence "presented on the stand" was to govern their decision and that damages could only be determined by an "exercise . . . [of the jury's] good common sense and . . . reason," no prejudice appeared in a portion of the closing argument of the plaintiff's counsel in which he asked the jury whether the pain and suffering were "worth" various specified sums per hour or per week. [463–464]

In an action for personal injuries resulting when a motor vehicle of the defendant ran into the rear of a stopped automobile in which the plaintiff was riding, no error appeared in a refusal of the judge to charge the jury that if the defendant was "confronted with a sudden emergency, his conduct was to be judged in the light" thereof, where the judge charged that negligence was "failure to do what the ordinary, prudent person would have done under the same and similar circumstances." [464–465]

Tort. Writ in the Superior Court dated September 25, 1963.

The action was tried before _Tomasello, J._

_Robert D. Callahan_ for William C. Foster.

_Charles W. O'Brien_ for Bay State Petroleum Co., Inc.

_Reuben Hall_ (_John J. Murphy_ with him) for the plaintiff.

Spiegel, J. This is an action of tort for personal injuries sustained by the plaintiff as a result of a motor vehicle accident. The accident involved an automobile in which the plaintiff was riding as a passenger and a tractor-trailer unit owned by the defendant Bay State Petroleum Co., Inc. and operated by the defendant William C. Foster.[1]

The jury returned a verdict for the defendant L and M

---

[1] The action was in three counts: count 1 against L and M Equipment Co.; count 2 against Foster; count 3 against Bay State Petroleum Co., Inc.

Equipment Co. and a verdict for the plaintiff against each of the other defendants. The case is here on the latter defendants' exceptions.

The plaintiff testified that he was riding in the back seat of an automobile, "stopped in traffic, when it was 'violently rammed' in the rear by a truck." Foster testified that "he was proceeding south in the center lane on the Southeast Expressway when the plaintiff's vehicle came out of the entrance at North Station into the center lane 50 feet ahead of the defendant's vehicle. An unidentified vehicle ahead of the plaintiff's vehicle slowed or stopped quickly forcing the plaintiff's vehicle to come to a sudden stop about 40 feet ahead of the . . . truck [which] was then proceeding about twenty-five miles per hour."

The evidence as to the plaintiff's injuries was as follows. The plaintiff testified that upon impact "his head went backwards and forward; he had a sensation 'like two stones rubbing together' and he felt a sharp pain." Dr. Richard Quintiliani, called by the plaintiff, testified that he first examined him four days after the accident. He diagnosed the injury as "cervical sprain and aggravation of pre-existing osteo-arthritis of the fifth and sixth cervical vertebrae." It was his opinion that a bony fragment, later found in the plaintiff's neck, was probably broken off from one of the neck vertebrae, and "that the accident in question was an efficient cause of the bone displacement." Dr. Quintiliani treated the plaintiff from March 11, 1963, until sometime in May of 1963. On March 11, 1963, the plaintiff felt in good health, with a minor exception. Thereafter Dr. Quintiliani observed the plaintiff practically every day until the end of June, 1964. In his opinion, the plaintiff will probably have a permanent residual effect from his injury.

Dr. Robert Hormel, an orthopedic specialist, testified that he first saw the plaintiff on April 30, 1963, "complaining of pain in his neck . . . which would increase as the day went on, and was associated with headaches, which would cause him to lie down and rest upon arriving home from work

. . . . Examination disclosed marked restriction of neck motions." He prescribed the use of a Thomas collar. He examined the plaintiff again in June and August and performed surgery in September to remove the bony fragment. He saw him "during his confinement, and at that time concluded that there was no evidence of systemic arthritis or general arthritic disease." He saw him again on several occasions in the year following the operation. "During this period the post-operative pain had been altered in that it was steady, but remained local in the neck, neck motions being quite restricted." The pain increased and he was confined to a hospital for traction and physical therapy. He was discharged on February 24, 1965, with a diagnosis of cervical osteoarthritis. It was Dr. Hormel's opinion "that . . . limitation of motion and his pain was different from the normal 58 year old person, and that the sort of injury which the patient sustained in this accident, assuming his history to be true, would bring about the pain that has been described." He stated that "the probabilities are that the patient's symptoms would continue about the same way as they are without much change, 'that he will continue to have a partial disability permanently.' " On cross-examination, he testified that the plaintiff was perfectly capable of doing all his work during the time he was treating him, except when he was hospitalized and convalescing.

Dr. Robert Dine, called by the defendants, testified that his examination of the plaintiff on October 22, 1963, showed that he "had moderate limitation of motion of his neck and, to this extent, was partially disabled."

1. An actuary, called by the plaintiff, testified over the defendants' objection that the life expectancy of a white male of the plaintiff's age and in good health at the time of the accident was 18.15 years. The defendants argue that this testimony should have been excluded because there was no showing that the plaintiff was in good health, or that his earning capacity had been impaired.

In view of the testimony of Dr. Quintiliani as to the plaintiff's health on March 11, 1963, the defendants' first point is not well taken.

Nor is there merit to the defendants' second contention. The life expectancy of the plaintiff was clearly relevant on the issue of the degree of expected future pain and suffering, which has always been an element of damages for personal injuries. "The sum of money fixed upon must be such as fairly compensates the injured person for the loss of time, the physical pain and the mental suffering, both that undergone in the past and likely to occur in the future." *Cochran* v. *Boston,* 211 Mass. 171, 172. There was ample testimony that the plaintiff's pain and suffering would continue indefinitely. In these circumstances the expert testimony as to the plaintiff's life expectancy was admissible, even though his earning capacity was not impaired. *Banks* v. *Braman,* 195 Mass. 97, 99.

2. Foster excepted to the admission of his answer to the following interrogatory of the plaintiff: "If the accident occurred because you were unable to bring to a stop the motor vehicle which you were operating, please set forth fully facts which account for your being unable to bring said motor vehicle to a stop." The following answer was admitted: "The defendant operator felt that the trailer did not stop as well as it should, and sometime afterwards the brakes were found to be faulty and were relined."

Foster argues that " [t]his answer embodied hearsay in that there was no evidence that the defendant had personal knowledge that 'sometime afterwards the brakes were found to be faulty and were relined.' "

The statute governing the questions which may be propounded by interrogatories and the use at the trial which may be made of interrogatories and the answers thereto is G. L. c. 231, §§ 61, 62, 89.[2] In *Warren* v. *Decoste,* 269 Mass. 415, 417, we reviewed the purpose of § 61, saying it was to

---

[2] Section 61 provides in material part, "Any party . . . may interrogate an adverse party for the discovery of facts . . . admissible in evidence at the trial of the case." Section 62 provides, "The answers shall be . . . signed by the party interrogated, who shall before making answer, make such inquiry of his agents, servants and attorneys as will enable him to make full and true answers to the interrogatories." Section 89 states in material part, "The answers of a party to interrogatories filed may be read by the other party as evidence at the trial."

"enable a party to interrogate his adversary to the same extent as would be permissible if he were called as a witness at the trial." Clearly, under this standard, the question propounded was a proper one. The answer given could have been based on Foster's personal knowledge. It was not "couched in terms of hearsay." Cf. *Falzone* v. *Burgoyne,* 317 Mass. 493, 497; *Altman* v. *Barron's, Inc.* 343 Mass. 43, 48.

Although evidence of repair in order to show negligence may be excluded (see *Shinners* v. *Proprietors of Locks & Canals,* 154 Mass. 168), we note that in the case at bar Foster made a general objection to the admission of his own answer at least part of which was plainly admissible. *Oehme* v. *Whittemore-Wright Co. Inc.* 279 Mass. 558, 565. See McCormick, Evidence, § 77.

3. The defendants excepted to a portion of the plaintiff's argument to the jury (set out in the margin)[3] relating to the "measurement of damages for pain and suffering."

The defendants maintain that this argument was prejudicial because there was no evidence of "permanent partial disability" and cite *Gardner* v. *State Taxi, Inc.* 336 Mass. 28, 31, in support of their contention. We do not agree. In the *Gardner* case there was no evidence to justify a finding of partial disability and we concluded that a fair construction of the argument of counsel in that case would cause the jury to construe it as an impairment of earning capacity.

---

[3] "With evidence by two doctors of permanent partial disability before you, is it worth a dollar an hour to have this pain and suffering, or is it worth more than that or less than that? This is for you ladies and gentlemen of the jury to decide, based on your experience. Is this permanent partial disability that the doctors have testified to worth — for the pain and suffering — $50.00 a week; is it worth $25.00 a week; is it worth $75.00 a week; is it worth $100.00 a week? You, ladies and gentlemen of the jury, based upon your experience in life, are the ones to determine whether it is worth more or less than that. In figuring this you may use the 16 or so years of life expectancy that Mr. Hill, the Actuary, testified to. If you don't want to accept that, give him till he's 70 or perhaps 10 years. As to the total disability during the eight to ten weeks, or whatever it was (and it is your memory of the evidence that counts, rather than mine), that the evidence says Mr. Cuddy was laid up, is it worth $100.00 a week; is it worth $200.00 a week; is it worth more or less than these figures? You, people of the jury, are the ones whose judgment is to be used to make that decision."

In the instant case Dr. Quintiliani testified that the plaintiff "will probably have a permanent residual effect from his injury" and Dr. Hormel testified that the plaintiff "will continue to have a partial disability permanently." Furthermore, the plaintiff's argument was directed only to pain and suffering.

In addition, the judge's charge to the jury[4] stated in unmistakable language the correct rule on the question of damages.

The defendants also maintain that the plaintiff's reference to possible per diem sums upon which the jury could calculate damages for pain and suffering was prejudicial under the rule of *Botta* v. *Brunner,* 26 N. J. 82. We have not had occasion to pass on this precise question before, nor do we find it necessary to do so in this case. Whatever dangers such a line of argument may be thought to present,[5] those dangers were adequately forestalled by the judge's charge to the jury.

4. Foster finally argues that the judge should have instructed the jury "that, if the jury should find that he was

---

[4] "[T]he determination of the facts is based upon the consideration of the evidence presented; that argument of counsel on either side is not the evidence that will guide you, but the evidence that has been presented on the stand is the evidence that will govern your deliberations and your decision. . . . As I say, then, if you do come to the question of damages, in so far as damages are concerned, you consider the pain and suffering, anguish of mind, disability, and of both past, present and future. And in relation to future consideration, you may consider these mortality tables, and with reference to longevity, in the consideration of the extent to which a person may or may not have been damaged or injured. You may consider them; you may disregard them, if you wish. That is your province, and your province alone, based upon the evidence presented. . . . And your recollection, as I say, is the one that governs. Not what the counsel may have stated, or what I am stating to you, nor what is on the blackboard; that is not evidence. But the evidence that you consider is the evidence that you recollect, and you alone determine the recollection of factors in so far as the case is concerned. . . . All of these factors you consider, and come to a decision in relation, as I say, to the matter of determining damages. *There is no formula by which we determine damages, if you come to that phase of it; and the only method by which you determine damages is to exercise your good common sense and your reason, as far as evidence is concerned, in relation to the injuries and the circumstances that bear upon the matter of injuries received as claimed, and the determination whether they have been substantiated. I would also like to say that the determination of dollars and cents is determined by the exercise of common sense"* (emphasis supplied).

[5] *Botta* v. *Brunner,* 26 N. J. 82, 91–104. Cf. *Beagle* v. *Vasold,* 65 Cal. 2d 166.

confronted with a sudden emergency, his conduct was to be judged in the light of such emergency and not by the standard of due care ordinarily required of the ordinarily prudent person under ordinary circumstances.''

We are satisfied that the judge's charge on the standard of care required was adequate.[6]

*Exceptions overruled.*

---

[6] The judge stated, ''The basic factor to be determined, then, is the negligence of the operator of the car proceeding from the rear. And as to negligence, it is the failure to do what the ordinary, prudent person would have done *under the same and similar circumstances* . . . . And what is a prudent man? It is determined not by the conduct of the most alert or the least alert of individuals, or the most intellectual or the least intellectual of the lot; but what the average person would do under the same and similar circumstances, is the test of what is required on the part of individuals in their relationship and conduct one to another. So you are to determine, then, in relation to the operator of the motor vehicle coming from the rear, as to whether or not that operator acted as an ordinary, prudent person in the operation of that motor vehicle. . . . Then you come to the question of a determination of negligence here. And in relation to the matter of collision of motor vehicles, one riding to the rear of another, the mere happening of an accident in and of itself is not negligence, and the mere happening of a rear end collision in and of itself is not evidence per se. There must be, in order for there to be establishment of negligence, some conduct on the part of the operator of the vehicle to the rear, in relation to its operation or in relation to his knowledge of any defect in mechanical function, and the operation based upon any defect if there is any; then the matter to be determined is whether at the time, regardless of whether there was a malfunction or not, or in relation to the operation — whether at the time, the car or motor vehicle in relation to distances from other vehicles and the like, nearness to it — whether at the time, the operator was not operating as an ordinary prudent person. That is the matter that you are to take under consideration and for your determination. I might state that, in relation to cars one going to the rear of another, that the operator of the car from the rear may not operate his motor vehicle so close that he may not within a reasonable time be able to stop, under normal conditions, in relation to traffic, hazard conditions, or the like, at the time of the happening of the events'' (emphasis supplied).