Diane ADAMS, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civil Action No. 91–11143–RCL.

United States District Court,
D. Massachusetts.

March 7, 1996.

John A. Finbury, Finbury, Sullivan & Lindauer, P.C., Haverhill, MA, for Plaintiff.

Susan M. Poswistilo, Assistant United States Attorney, Paul G. Levenson, Assistant United States Attorney, U.S. Attorney's Office, Boston, MA, for Defendant.

**1.** Defendant argues, in part, that the amendment claiming an additional $30,000 is untimely and, hence, plaintiff's damages cannot exceed the original, claimed amount of $50,000 in personal injuries and $2,000 in property damage. Defendant also submits that plaintiff's amended claim does not constitute "newly discovered evidence" within the meaning of 28 U.S.C. § 2675(b). (Docket Entry # # 37 & 46).

*MEMORANDUM AND ORDER*

BOWLER, United States Magistrate Judge.

Plaintiff Diane Adams ("plaintiff"), a Massachusetts resident, filed this negligence action against defendant United States of America ("defendant") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) & 2671–2680. Plaintiff seeks recompense for personal injuries and property damage resulting from an October 8, 1988 accident involving her motor vehicle and a United States Post Office vehicle. The accident occurred in Haverhill, Massachusetts.

*PROCEDURAL HISTORY*

Plaintiff initially filed an administrative claim on the appropriate Standard Form 95 ("SF 95") at the Boston office of the United States Postal Service. (Ex. A). Therein, she claimed personal injuries in the amount of $50,000 and property damage in the amount of $2,000. Plaintiff subsequently filed an amendment claiming an additional $30,000 in allegedly unforseen injuries due to a six week treatment for chronic pain in April and May of 1991 at the New England Rehabilitation Hospital in Woburn, Massachusetts.[1] (Ex. A, 7, 14, 14a, 15 & 15a).

Plaintiff filed suit in April 1991. Thereafter, defendant stipulated that it was negligent. (Docket Entry # 15). The parties consented to a bench trial before this court in accordance with 28 U.S.C. § 636(c). (Docket Entry # 29).

During the course of a two day trial, this court heard the testimony of: (1) plaintiff; (2) defendant's expert, Gerald F. Winkler, M.D. ("Dr.Winkler"), a board certified neurologist practicing at Massachusetts General

This court need not decide either contention because the issue is moot. As discussed *infra*, this court declines to award plaintiff damages in excess of the $50,000 in personal injuries and $2,000 in property damage claimed in the original SF 95. Further, this court declines to award damages for plaintiff's treatment at the New England Rehabilitation Hospital in 1991 inasmuch as this court finds no causal connection.

Hospital; (3) John E. Houle ("John Houle"); a letter carrier in the neighborhood where plaintiff resided at and around the time of the accident; and (4) Joanne McEnaney, Althea Sheehan and Denise Sheehan, all neighbors of plaintiff's at the time of the accident. The record also contains the deposition of plaintiff's expert, William A. Mitchell, Jr., M.D. ("Dr.Mitchell"), a board certified orthopedic surgeon. (Ex. 20).

Plaintiff's two count complaint requests damages for personal injuries in Count I and property damage in Count II resulting from defendant's negligence. Mindful that the primary issue in this case is the existence and the extent of plaintiff's damages causally related to the accident, this court finds the following facts.

## FACTUAL FINDINGS

Plaintiff, a 40 year old married woman with four children, presently resides in Bradford, Massachusetts. On the day of the accident, October 8, 1988, plaintiff was 34 years old and lived on Brookdale Lane in Haverhill, Massachusetts. She maintains that she continues to suffer back, neck and hip pain due to the October 8, 1988 accident.

### I. Plaintiff's General Medical History

Plaintiff's more recent back problems began in 1986 when she pulled a muscle on the right side of her back while lifting an object at work at the Borden Chemical Company. After notifying her employer, she went to a hospital and received treatment for the injury as an outpatient. Thereafter, she returned to work after a previously scheduled absence of a few days. She testified that the injury left her with no residual pain or loss of motion. As explained in greater detail *infra*, plaintiff also visited another hospital in July 1988 due to back pain.

Prior to the October 8, 1988 accident, plaintiff also experienced pain in her arms

and wrists. In 1983 she had pain in her left elbow with minor aches thereafter. She also testified to receiving a diagnosis of rheumatoid arthritis in her right arm and wrist in June or July of 1988. Plaintiff testified that the arthritis was localized to these areas and did not travel to her neck, back and/or hip.[2] Although she experienced pain associated with the arthritis during the month prior to the accident, she has had no problems with arthritis since the accident.[3]

Plaintiff additionally testified to having pneumonia on an annual basis. Before the October 8, 1988 accident, she also suffered from respiratory problems. She began taking Xanax[4] on an irregular, as needed basis several years prior to the accident. According to plaintiff, her anxiety significantly increased after the accident.

Plaintiff additionally stated that she experienced migraines prior to the accident. Shortly after the accident, she testified to suffering severe headaches emanating from the left side of her neck and shoulders into the area of her eyes.

Plaintiff's medical records show a series of various ailments existing prior to the accident and continuing thereafter. Since 1982 plaintiff has experienced abdominal pain particularly in the lower left quadrant and front side of her abdomen. Medical records show that she complained of such pain during visits to a physician in September 1988 and in March and May of 1989. She visited the emergency room of the Hale Hospital in Haverhill in December 1991 in a tearful condition stating that she knew she had ulcers again.

Plaintiff also has a history of menstrual difficulties and gynecological problems including the removal of lumps from her breast and a history of cryosurgery for condylomata. Medical records in April 1989, a

---

**2.** A statement in plaintiff's medical record in November 1992, however, recites her then existing physical condition as pain radiating up her arm into her shoulder. (Ex. C).

**3.** On redirect, plaintiff clarified her testimony by stating that she experienced minor arthritic pains in her wrists and left elbow after the accident.

**4.** This court takes judicial notice that Xanax is an antianxiety medication. American Medical Association, *Drug Evaluations* (6th ed.1986).

few months after the accident, concerning treatment for menstrual problems significantly note plaintiff's acknowledgment that everything was going "much better for her except that her mother has had a brain tumor" and three operations resulting in a lot of stress.[5] Plaintiff visited the emergency room at Hale Hospital in September 1991 complaining of pelvic pain. An ultrasound of her pelvis showed a slightly enlarged uterus but revealed no focal masses, fibroids or ovarian cysts.

Medical records reflect that plaintiff experienced difficulties in her left eye including blurred vision prior to the accident in the summer of 1988. She also complained of pain in her left foot resulting in a diagnosis of tendinitis in September 1988.

The medical records further demonstrate that plaintiff visited the Hale Hospital emergency room in July 1988 for pain in her hip and lower back. Medical records describe plaintiff's complaint as "severe pain left side of hip" but the nurse's notes describe pain in plaintiff's right hip. At trial, plaintiff insisted that she complained about pain in her right hip during the July 1988 visit. She testified that she recovered within a two to three day period.

## II. *The Accident*

On the day of the accident, plaintiff was driving in an automobile with her niece in the front passenger seat. Both plaintiff and her niece had their seatbelts fastened. A postal truck, operated by a United States Postal Service employee, struck and hit the left, driver's side of plaintiff's automobile.[6] The impact of the postal truck pushed plaintiff's vehicle onto a guard rail. At the time of the collision, plaintiff's body was twisted to the right in order to restrain her niece.

## III. *Plaintiff's Specific Medical History*

After the accident, plaintiff began experiencing headaches and a stiff neck. She telephoned her physician at the time, Dr. Roger N. Gutner ("Dr.Gutner"), on the day of the accident. Dr. Gutner advised plaintiff to take Tylenol for the pain and, in the event it worsened, to go to the hospital.

On Monday October 10, 1988, plaintiff followed Dr. Gutner's advice and went to the emergency room at the Hale Hospital with her husband. A physician, identified in the records as Dr. Gilbert, examined plaintiff and ordered x-rays of her neck. Dr. Gilbert noted that plaintiff had numbness in both arms and complained of pain when turning her head from left to right. He also noted tenderness in the area of the mid to lower cervical spine and in the area of the left trapezius muscle. The radiology report described a loss of cervical curvature consistent with a muscle spasm and no fractures.

■ Dr. Gilbert diagnosed plaintiff as having a whiplash cervical strain. He prescribed a cervical collar and a Soma compound.[7] Plaintiff wore the collar intermittently during the weeks immediately following the accident.

Medical bills for the services of Dr. Gilbert and the radiologist totaled $85 and $58 respectively. In addition to the costs of the x-rays and the services associated therewith of $81 and $36, plaintiff's total medical expenses for the October 10, 1988 hospital visit were $260. (Ex. 1a, 2 & 3).

A few days later, on October 13, 1988, plaintiff visited an orthopaedic physician, Dr. Leonard Popowitz, F.A.C.S. ("Dr.Popowitz") of Haverhill Orthopaedics, Inc. in Haverhill. Dr. Popowitz's notes reflect that plaintiff had a sudden whiplash injury but did not immediately experience pain. Shortly after the accident, plaintiff began to have headaches and pain in her neck area.[8] Plaintiff generally

---

5. Such records are admissible under either Rule 803(4) or (6), F.R.E., and, alternatively, under Rule 803(24), F.R.E.

6. As previously noted, defendant stipulates to negligence.

7. This court takes judicial notice that Soma is a trademark for preparations of carisoprodol, a muscle relaxant. *Dorland's Illustrated Medical Dictionary* (26th ed.1981).

8. According to Dr. Winkler, patients suffering cervical injuries can sometimes experience headaches. Dr. Winkler testified that it is difficult to differentiate between migraine headaches and other types of headaches due to the absence of objective tests for such conditions.

complained to Dr. Popowitz of aching pain on the left side of her body in the areas of her back, shoulder, neck and hip.

Dr. Popowitz found that plaintiff had a full range of motion in her cervical spine. His office notes additionally describe the neurological examination as negative. Dr. Popowitz noted tenderness in the area of the left supraclavicular vertebra and "the medial aspect of the scapula." He diagnosed plaintiff as having mild cervical radiculitis and prescribed a course of physical therapy visits. Dr. Popowitz also noted that plaintiff had not yet filled her prescription for Soma as of that date, October 13, 1988. (Ex. 4).

On October 17, 1988, plaintiff had her first physical therapy visit with C. Anthony Bourn ("Anthony Bourn"), a registered physical therapist practicing in Haverhill. After taking a medical history, he proceeded to administer hot packs and an exercise program. Plaintiff had repeat physical therapy visits with Anthony Bourn wherein she received hot pack treatments, massage, ultrasound and/or an exercise program on October 18, 20, 24, 26, November 1, 3, 8, 10, 22, 23, 28, December 8 and 14, 1988 and January 5, 1989. The total cost of the visits was $635. Anthony Bourn's notes reflect that plaintiff's pain centered in the area of the left side of her scapula, upper hip and arm.

On November 10, 1988, plaintiff returned to Dr. Popowitz for a second visit. His office notes evidence that she was experiencing continued pain in the neck area, particularly on the left side of her neck. Dr. Popowitz further indicated that plaintiff was wearing the neck collar on an "on and off" basis. Dr. Popowitz's neurological exam of plaintiff was negative. (Ex. 4).

On January 9, 1989, plaintiff returned to Dr. Popowitz. Although Dr. Popowitz noted her "many complaints, neck, back [and] hip," he did not uncover "anything neurologically." He ordered x-rays of her pelvis area and left hip and "a bone scan to see if anything shows up." If the bone scan proved negative, Dr.

Popowitz believed that plaintiff "should try to be motivated to return" to her previous normal routine duties.

The medical bill for plaintiff's visits to Dr. Popowitz at Haverhill Orthopaedics, Inc. on October 11 and November 10, 1988 and January 9, 1989 totaled $205. (Ex. 4a).

On February 7, 1989, plaintiff underwent a bone scan at the Hale Hospital at a cost of $250. The scan showed "normal uptake over the head and neck region." Hospital notes describe the scan as indicating "no unusual activity . . . in the cervical spine either hip or in the knee area, bilaterally." The resulting impression was normal. (Ex. 6 & 6a).

Dissatisfied with Dr. Popowitz's seemingly unresponsive manner regarding her complaints of pain, plaintiff began seeing another physician in March 1989, Dr. Mitchell, a board certified orthopedic surgeon.[9]

On March 21, 1989, plaintiff had her first visit with Dr. Mitchell at a cost of $75. Plaintiff complained of stiffness in her cervical spine and pain in her lower back with intermittent tingling into the left leg. She did not voice any complaints about her right upper extremity. Dr. Mitchell noted that the x-rays initially taken after the accident revealed a straightening of the normal cervical lordosis which was consistent with a muscle spasm. In Dr. Mitchell's opinion, the x-rays therefore confirmed the nature of plaintiff's subjective complaints.

Dr. Mitchell completed a full examination of plaintiff's musculoskeletal systems including her spine and extremities. He noted a full range of motion in her upper arms. He also described the existence of mild tenderness during rotations of plaintiff's cervical spine with more predominant tenderness and pain in the left scapula. Dr. Mitchell characterized plaintiff as neurologically completely intact.

Dr. Mitchell also performed a straight leg test which demonstrated tightness bilaterally in plaintiff's lower back, primarily on the left

9. Dr. Mitchell's curriculum vitae shows extensive experience in the area of sports medicine. He presently maintains a private practice in Brookline, Massachusetts. A member of the American Orthopedic Society of Sports Medicine, he was an assistant team physician for the U.S.A. Alpine Team for a number of years. The subject of most, if not all, of his published papers, however, is the knee as opposed to the spine, hip or neck areas of the body.

side. According to Dr. Mitchell, the positive finding of the straight leg test was indicative of musculoskeletal pain in the lumbar spine and pelvic muscles. Dr. Mitchell further noted, however, that plaintiff did not experience pain with forward or backward bending.

█ Dr. Mitchell diagnosed plaintiff as suffering multiple strains or sprains in her spine and advised her to continue physical therapy. He therefore gave her a referral for physical therapy visits to treat her back and neck area using modalities such as ultrasound, massage and a TENS ("Tens") unit.[10] Dr. Mitchell also provided plaintiff with samples of a muscle relaxant drug. Plaintiff discontinued using the medication, however, due to nausea. She testified to experiencing the same side effect in response to another medication prescribed by Dr. Mitchell.

After plaintiff's March 1989 visit with Dr. Mitchell, she began a course of physical therapy treatments at the Northeast Rehabilitation Hospital in Salem, New Hampshire beginning on May 17, 1989. Her treatments centered in the area of the left side of her back and neck and consisted of an exercise program, massage, hot packs and a Tens unit. Similar to Anthony Bourn's treatment, the therapist also treated plaintiff's lower back and left hip.

Plaintiff underwent physical therapy from late May through the summer of 1989 on at least a weekly basis. (Ex. 8 & 8a). Costs of the visits totaled $278.87, $339.30, $704.92 and $442.14 resulting in a total cost of $1,765.03. (Ex. 8a).

█ Plaintiff also used a Tens unit at home on a regular basis primarily on her neck between her shoulder blades. Progress notes dated July 3, 1989, show that plaintiff reported feeling much better with the Tens unit [11]

During this time period, plaintiff generally complained of pain in the left area of her back, neck, hip and in the area where her shoulders join together. She testified that she continued to experience this pain in the summer and the fall of 1989 as well as in the winter of 1990.

On September 5, 1989, plaintiff had a second visit with Dr. Mitchell. She reported persistent pain in the neck region and in the muscles surrounding her shoulder. Dr. Mitchell noted, however, an improvement in plaintiff's cervical motion.

Plaintiff visited Dr. Mitchell again on November 9, 1989. Office notes reflect that plaintiff had only limited range of motion in her cervical spine with pain radiating along her scapula. Dr. Mitchell additionally described tenderness in the cervical, thoracic and lumbar region of the spine, predominantly on the left side. He also noted that plaintiff reported using the Tens unit on a daily basis. Neither Dr. Mitchell's September nor November 1989 office notes mention any complaint concerning plaintiff's left leg. Invoices for the Tens unit show a $450 cost for the unit with additional equipment of $103.60. (Ex. 13).

In November and December 1989 plaintiff underwent physical therapy at the Hale Hospital. Treatment involved therapy to her neck and back. Progress notes show that plaintiff had "many areas of acute pain," including her cervical and lumbar spine area and in both hips. (Ex. 9). Invoices for these visits totaled $934. (Ex. 9a & 10a).

Plaintiff continued physical therapy at the Hale Hospital in January and February 1990. Her treatment included massage, exercises, electrical stimulation and ultrasound. Progress notes evidence that plaintiff reported experiencing intense pain and moderate to severe muscle spasms. Invoices for the January and February 1990 physical therapy treatments totaled $360 and $356 respectively. (Ex. 11a & 12a).

Dr. Mitchell saw plaintiff for another follow up visit on January 3, 1990. He testified that he felt she was doing better and re-

---

10. This court takes judicial notice that Tens is an acronym for transcutaneous electrical nerve stimulator. *Random House Dictionary of the English Language* (2nd ed.1987). Dr. Mitchell described a Tens unit as a stimulating device which produces small electrical currents and thereby alters a patient's perception of pain in the affected area.

11. Such statements reflect plaintiff's then existing state of mind. Rule 803(3), F.R.E.

sponding to massage and the Tens unit. He characterized plaintiff's spine mobility as improved.

Thereafter, however, Dr. Mitchell testified that her symptoms did not improve and, in general, waxed and waned. Plaintiff's application for social security disability benefits in 1989 and 1990 was denied.

In February 1991, according to plaintiff's testimony, she fell off a chair onto her left hand and scraped her fingers. On cross examination, she acknowledged that the fall did not worsen her back problems.

Shortly thereafter, she visited Dr. Mitchell who prescribed a back brace for her which she continues to use.[12] Dr. Mitchell recommended that plaintiff receive treatment in a chronic pain clinic due to her debilitating complaints and his belief that her symptoms had not responded to other, more conservative treatments. He therefore referred her for a consultation at the Whittier Rehabilitation Hospital in Haverhill.

On March 7, 1991, plaintiff saw Dr. Sungyul Kim ("Dr. Kim") at the Whittier Rehabilitation Hospital.[13] Medical records signed by Dr. Kim recite plaintiff's complaints of pain in her neck, back and hip and also describe the more recent injury to her hand. The notes also show plaintiff's feelings of guilt thereby evidencing her anxiety. An invoice for plaintiff's visit to Dr. Kim shows a total cost of $125. (Ex. 14 & 14a).

From April 24 or 25 to May 23, 1991, plaintiff was an inpatient at the New England Rehabilitation Hospital ("rehabilitation center") in Woburn, Massachusetts. Hospital records identify Dr. Kim as the referring physician.[14] The cost of the program totaled $29,564.21 with an additional cost of $195 for acupuncture treatments. (Ex. 15a & 16).

Hospital records show that on April 26, 1991, plaintiff's range of motion in her cervical spine was "somewhat limited secondary

mostly to fear and soft tissue tightness." Her left upper extremity muscle strength and range of motion was normal. There was also no evidence of weakness in muscle strength or atrophy. During her stay, plaintiff demonstrated an ability to perform gardening.

The discharge summary states that plaintiff reported a 90% relief in her condition with acupuncture treatment. The summary described that, upon discharge, plaintiff's condition was that her chronic pain syndrome was resolved and that her neurosis and anxiety had improved. (Ex. 15). Plaintiff similarly testified that, although she continued to experience pain, her condition had improved by the time of her May 23, 1991 discharge and she knew that she could try and live normally. She acknowledged, however, that when she returned home she was not faithful in continuing the rehabilitation center's home exercise program.

Plaintiff did not visit Dr. Mitchell again until June 1992, more than one year after her stay at the rehabilitation center. Dr. Mitchell testified that she was experiencing an exacerbation of pain in her lower back and having difficulty with her left leg. He opined that such symptoms were consistent with a long term disfunction of the spine which was musculoskeletal in nature. A mechanical disfunction consists of a loss of mobility due to muscular spasm and pain in the muscles controlling the motion of the spine, according to Dr. Mitchell.

Dr. Mitchell's medical records reflect that he saw plaintiff for follow up visits in October 1993 and February 1994. Therein, he notes the persistence of chronic cervical thoracic lumbar spine complaints. He describes her symptoms as essentially unchanged and that she has an inability to lift and carry objects with confidence. (Ex. 7).

In Dr. Mitchell's opinion, the October 8, 1988 accident was causally related to her

---

**12.** Plaintiff explained that the automobile ride to Dr. Mitchell's office increased her back pain.

**13.** Dr. Kim's notes reflect plaintiff's state of mind and then existing physical condition. Dr. Kim's medical history reflects statements made by plaintiff for purposes of receiving medical treat-

ment. As such, they are not hearsay. Rule 803(3) & (4), F.R.E.

**14.** Portions of such records, admitted into evidence without objection, constitute business records. Rule 803(6), F.R.E.

symptoms. According to Dr. Mitchell, plaintiff's condition remained unchanged at the time he last saw her in February 1994. He further opined that plaintiff suffered a permanent loss of function affecting 20% of her body. In his opinion, plaintiff's condition had reached an end medical result which would remain with her for the remainder of her life. Although noting the lack of success with physical therapy, he also believed it was in her best interest to continue some form of physical exercise and, if necessary, to take analgesic and anti-inflammatory medication.

On direct examination, Dr. Mitchell stated that he based his opinion on the fact that plaintiff had no prior history or complaints relative to her spine before the accident.[15] After the accident, however, he explained that she experienced an immediate onset of symptoms.[16]

On cross examination, Dr. Mitchell acknowledged that plaintiff was completely intact neurologically and that her x-rays were unremarkable. She did, however, have a positive straight leg test during his initial March 1989 examination. Such a test depends partly on the patient's response to the movement and partly on the presence of muscle spasms, according to Dr. Mitchell. He further characterized plaintiff as having a "profound restricted loss of spine mobility."

Dr. Mitchell had no recollection of reviewing any notes from Dr. Gutner. Dr. Mitchell also could not recollect plaintiff's treatment for anxiety except for the indications of such treatment in the hospital records from plaintiff's month long stay at the rehabilitation center.

Although Dr. Mitchell stated that he was not an expert in anxiety disorders, he opined that anxiety is a secondary rather than a primary cause of chronic pain syndrome. He testified on redirect that a musculoskeletal injury could potentiate or increase the level of a patient's anxiety.

In sharp contrast to Dr. Mitchell's testimony, Dr. Winkler, defendant's expert, testified that plaintiff's cervical strain resulting from the accident was a temporary problem.[17] Dr. Winkler conducted only one examination of plaintiff on October 12, 1993. Although Dr. Winkler did not examine plaintiff as frequently as Dr. Mitchell or as close in time to the accident, his review of plaintiff's medical records and reports appears far more extensive and complete than Dr. Mitchell's review.[18] In addition to reviewing Dr. Mitchell's records, Dr. Winkler examined physical therapy reports from Anthony Bourn,[19] records from Dr. Popowitz,[20] records from the Hale Hospital, physical therapy records from the Northeast Rehabilitation Hospital, records from the Whittier Rehabilitation Hospi-

15. Plaintiff testified that the day before the October 8, 1988 accident she was essentially pain free. According to plaintiff, she experienced no pain in either her neck, back or hips. She also testified that the pain she continues to experience as of the date of trial is the same that she had in October 1988.

16. The basis for his opinion would, of course, also include his examinations and treatment of her condition.

17. Dr. Winkler's qualifications are unquestionable. His curriculum vitae shows professional training at Harvard Medical School and Massachusetts General Hospital all in the area of neurology. Presently, he holds the position of Associate Neurologist at Massachusetts General Hospital, is a visiting teacher for the Neurology Ambulatory Unit at the Massachusetts General Hospital and is also Assistant Clinical Professor of Neurology at Harvard Medical School. He has received numerous awards and fellowships and published reports, reviews, books and abstracts in the area of neurology. He is also a

member of the Boston Society of Psychiatry and Neurology and is therefore familiar with psychological as well as neurological problems. Independent medical examinations constitute an estimated half of the patients he sees at the present time.

18. Dr. Winkler's knowledge and familiarity was fully apparent during his direct examination and during his cross examination.

19. As pointed out on cross examination, these records reviewed by Dr. Winkler for purposes of rendering an expert opinion reflect plaintiff's statement that she had low back pain the day after the accident, pain in the upper left hip on November 1 and 10, 1988, and pain in the left hip on November 28, 1988.

20. As pointed out on cross examination, these records reviewed by Dr. Winkler for purposes of rendering an expert opinion state, in part, that on January 9, 1989, plaintiff continued to have complaints about her back and hip. An x-ray of her pelvis and left hip proved negative.

tal,[21] plaintiff's deposition testimony and answers to interrogatories,[22] records from plaintiff's month long stay at the rehabilitation center,[23] laboratory reports, a dermatologist's report; Dr. Mitchell's deposition and records from Drs. Bruce Berkeley, Glenn Kimball and Henry Leonardi.

Dr. Winkler further noted plaintiff's extensive history of classic migraine headaches as far back as 1973.[24] Dr. Winkler pointed out that Dr. Gutner's notes, which he also reviewed in arriving at his opinion, include plaintiff's reports of unusual headaches in the 16 months preceding November 1992. Dr. Winkler deemed plaintiff's headaches, which appear throughout her medical records, particularly significant.

Dr. Winkler also emphasized the significant history of depression or anxiety contained in plaintiff's records. He noted that plaintiff's brother was hospitalized for depression and that depression tends to run in families. Plaintiff's medical records included numerous references to depression, according to Dr. Winkler. He explicitly noted an August 1989 reference by Dr. Gutner that plaintiff's symptoms were functional inasmuch as she was able to perform day to day functions such as sitting, lifting and standing and were due to depression.

Dr. Winkler also expressly pointed out that Dr. Popowitz's range of motion test, performed five days after the accident, showed a normal range of motion. Similarly, Dr. Winkler noted that Dr. Mitchell found a normal range of neck motion on March 21, 1989.

Dr. Winkler additionally reviewed records from the rehabilitation center wherein, according to their testing, plaintiff was able to lift 15 and one half pounds from her waist to her shoulder three times and from her knees to her waist three times. As pointed out by Dr. Winkler, these records also recite plaintiff's ability to lift 16 and one half pounds from the floor to her waist three times and her ability to carry this weight for a distance of 160 feet. Dr. Winkler also listened to plaintiff's recitation of her activities and capabilities performing household chores, caring for her children, marketing, driving, mowing, gardening and pushing but not lifting snow.

Dr. Winkler's October 1993 examination of plaintiff included range of motion tests, which usually involve both objective and subjective findings,[25] directed toward the areas of the neck and lower back. Dr. Winkler found plaintiff's range of motion was normal except for moving her face to the left where she exhibited only half to two thirds of the normal range of motion. Dr. Winkler tested plaintiff's reflexes, balance, strength and coordination by having plaintiff sit or stand in various positions and perform certain exercises. He additionally observed plaintiff's ability to bend in various directions and listened to any reports of tenderness she expressed.

Based on his review of plaintiff's medical records and medical history as well as his October 1993 examination of plaintiff, Dr. Winkler believed that plaintiff suffered a cervical sprain due to the October 8, 1988 accident. He also based his conclusion on the objective findings depicted in the x-rays taken shortly after the accident. As previously noted, these x-rays describe a "slight cervical curvature" and a "loss of the usual cervical

21. As pointed out on cross examination, these records reviewed by Dr. Winkler for purposes of rendering an expert opinion reflect, in part, plaintiff's complaints of pain after the accident in her neck, interscapular area and lower back.

22. As pointed out on cross examination, these records reviewed by Dr. Winkler for purposes of rendering an expert opinion also include plaintiff's recitations of pain in her back and left hip.

23. As pointed out on cross examination, these records reviewed by Dr. Winkler for purposes of rendering an expert opinion show plaintiff's complaints of pain in the area of the lower back.

24. According to Dr. Winkler, there are two categories of migraine headaches, classic and common. Unlike common migraine headaches, classic migraine headaches are accompanied by a neurological deficit such as a loss of vision or paralysis. Common headaches lack this neurological component.

25. Objective findings consist of any information acquired by the physician which does not require a verbal response on the part of the patient. Subjective findings consist of any facial reactions on the part of the patient such as grimacing or any verbal reports of pain.

lordotic curvature consistent with muscle spasm." (Ex. 1).

Dr. Winkler additionally believed that plaintiff's problems with her lower back and left hip did not stem from the October 8, 1988 accident. He supports this view, in part, by noting that these complaints did not arise immediately after the accident. In his view, complaints of pain associated with soft tissue injuries ordinarily surface within 36 to 48 hours after the trauma. He pointed out that the contemporary histories did not verify plaintiff's complaints of pain in her lower back and hip which appear in her deposition testimony, answers to interrogatories and the notes of Anthony Bourn. Accordingly, Dr. Winkler believed that plaintiff's condition and diagnosis was limited to that of a cervical strain and did not encompass a diagnosis of lumbar strain and/or thoracic strain.

To support his view, he opined that strains or sprains do not persist over a period of years. Dr. Winkler testified that any pain associated with a strain or a sprain generally lasts for three months or, at best, a period of six months. Sprains and strains all heal within that period of time, according to Dr. Winkler. In Dr. Winkler's opinion, therefore, plaintiff's complaints surfaced too late in time after the accident to be attributable or causally related to the accident.

On cross examination, Dr. Winkler did not disagree with a diagnosis of chronic pain syndrome for plaintiff's condition. He defined the syndrome, however, as a person who has long standing pain which, in plaintiff's circumstance, has no objective explanation. Such a condition, he surmised, is very often due to depression. Dr. Winkler therefore thought that the cause of plaintiff's chronic pain syndrome was depression. He also posited that anxiety and depression can account for the exacerbation of pain in a situation where the degree of physical injury would otherwise lead to a complete absence of symptoms within three months.

In addition, Dr. Winkler opined that the cervical sprain suffered by plaintiff was not permanent. Rather, in Dr. Winkler's opinion

plaintiff experienced a temporary impairment lasting from the October 8, 1988 accident to January 1989. He based this conclusion, in part, on Dr. Popowitz's January 1989 notation that plaintiff should try to be motivated to return to her previous status in the event of a negative bone scan. The bone scan subsequently performed on plaintiff proved negative. Dr. Winkler also reiterated that Dr. Mitchell's findings indicate plaintiff's range of neck motion in March 1989 was normal. Dr. Winkler pointed out that three months is generally the average period of recovery for a cervical strain. He also testified that records from the rehabilitation center in May of 1991 corroborated his view that plaintiff could function without restrictions.

After the October 8, 1988 accident and before she entered the rehabilitation center in late April 1991, plaintiff testified that she could no longer play football or basketball with her children. She also curtailed rearranging furniture on a regular basis and limited her household chores, according to her testimony. She stated that she could no longer stand and complete washing the dishes without experiencing pain. She testified that the accident also affected her ability to shovel snow and to mow the lawn. After the accident, she stated that she could no longer take long walks, lift her sons, dance and/or roller skate with her children without experiencing pain.

Plaintiff also testified that she tried to resume her normal activities such as shoveling snow and mowing the lawn after her discharge from the rehabilitation center. She stated that she was either incapable of or had difficulty with shoveling snow.

Nevertheless, on cross examination plaintiff testified that from January through May 1990 [26] she participated in a bowling league, won a tournament and was able to bowl during this time period. On redirect, however, plaintiff changed her testimony by stating that she participated in the league from January through May of 1989. She also stated on redirect that she did not bowl in 1990,

---

**26.** The year 1990 corresponds with medical records dated February 1990 wherein plaintiff insisted that bowling did not aggravate her pain.

1991, 1992 and 1993 because of the pain in her back, neck and shoulders.

John Houle, a United States Postal Service employee, delivered mail to plaintiff in the months following the accident. He testified that he remembers one occasion where he noticed that plaintiff was speaking with her neighbors and not wearing her neck brace. Upon viewing his vehicle, however, plaintiff went inside the house and returned outside wearing her neck brace.

Joanne McEnaney, plaintiff's former neighbor who began residing on Brookdale Lane in Haverhill, plaintiff's former address, in December 1991, testified that plaintiff lived on Brookdale Lane until in or around September 1993. Throughout this time period, Joanne McEnaney saw plaintiff lift grocery bags and boxes. At the time of plaintiff's move from the neighborhood in or around September 1993, Joanne McEnaney witnessed plaintiff lifting furniture and boxes. Joanne McEnaney also viewed plaintiff lifting and carrying her 11 or 12 year old son up a series of steps.

During the summer of 1992 Joanne McEnaney observed plaintiff gardening and digging soil. She also saw plaintiff frequently running across the street in high heels in the winters of 1992 and 1993. Joanne McEnaney recalls seeing plaintiff in 1993 run down the street after hearing that someone had hit her son. Joanne McEnaney also viewed plaintiff playing with her children, tossing them balls or frisbees, in the summers of 1992 and 1993.

In addition, Joanne McEnaney observed plaintiff shovel snow during the winters of 1992[27] and 1993 on a frequent basis. In particular, she saw plaintiff shovel the walkway between plaintiff's residence and the residence of her adjoining neighbor. In fact, according to Joanne McEnaney, plaintiff's adjoining neighbor often paid plaintiff $10 to shovel snow for him. Joanne McEnaney also witnessed plaintiff shovel snow around her automobile and the automobile of her adjoining neighbor. At one point in time, Joanne McEnaney viewed plaintiff pushing an automobile out of the snow.

Although Joanne McEnaney and plaintiff were neighbors for more than a two year period, they were not friends, according to Joanne McEnaney. Indeed, she acknowledged that there was hostility between her family and the Adams' family as of March 1993 when she filed criminal charges for trespassing and property damage which resulted in the issuance of a restraining order.

Althea Sheehan, a friend and former neighbor of plaintiff's when plaintiff lived at the Brookdale Lane address, similarly testified that she witnessed plaintiff shoveling snow. Specifically, she observed plaintiff shoveling snow in January 1990 on several occasions. Althea Sheehan also saw plaintiff moving furniture around the house after the October 8, 1988 accident on a consistent basis. In 1992, Althea Sheehan viewed plaintiff gardening and, in the course of digging a hole, actually jumping on a shovel to force it into the ground. In 1990, plaintiff assisted Althea Sheehan and her daughter in removing a stump from the ground in their yard. Althea Sheehan additionally witnessed plaintiff playing with her children and running after the accident. During the process of moving out of the neighborhood in 1993, plaintiff lifted an entertainment center with her husband into their automobile, according to Althea Sheehan. In comparing plaintiff's activities both before and after the accident, Althea Sheehan believed that plaintiff's activities remained essentially the same.

Denise Sheehan, Althea Sheehan's daughter who resided on Brookdale Lane from November 1988 to April 1994, also witnessed plaintiff assisting her and her mother pull the aforementioned stump from the ground. In the process, she saw plaintiff lean against the building and push with her legs to break the remaining roots of the stump out of the ground. Denise Sheehan also testified that in the summer of 1994 plaintiff lifted Denise Sheehan's one and a half year old son at a time when he weighed 25 pounds.

**27.** As previously noted, Joanne McEnaney moved into plaintiff's former neighborhood in December 1991 and resided in the neighborhood until plaintiff moved in or around September 1993.

She observed plaintiff shoveling snow in December 1991 through the winter months of 1992 and in the following winter of 1992/1993.

In the winter of 1991 to 1992, Denise Sheehan took a photograph of plaintiff, exhibit E, wherein plaintiff is seen bending over shoveling snow. Denise Sheehan took two additional photographs of plaintiff on the same day shoveling snow, exhibits D and F. Exhibit F shows plaintiff bending over to her waist and making an obscene gesture in the direction of the photographer, Denise Sheehan.[28]

Before the accident, plaintiff's job history was not steady. Prior to the accident, she had worked various jobs including as a nurse's aide, cashier, receptionist, machine operator, tax preparer and waitress. She usually held these jobs for a period of a few months and no longer than a period of one year.

Prior to the accident and at the time of the accident plaintiff testified that she was planning to return to the work force possibly as a nurse's aide and, with further training, as a nurse. She testified that the duties of a nurse's aide include lifting and meeting with patients which she felt she could no longer perform after the accident. Notwithstanding her stated interest in nursing, plaintiff neither studied nursing in college nor attended any course in the field of nursing. Shortly before the accident, in April 1988 she left her employment as a waitress after a three month period due to arthritic pain in her left wrist.

After the accident, plaintiff worked as a cashier for a few weeks in 1990. According to her testimony, she discontinued working because of severe headaches and pain associated with bending over to write. She also worked as a part time driver for the elderly from January to May of 1992. Plaintiff left this employment, however, because she felt she could not physically perform the job due to difficulties associated with driving and lifting objects. In 1993 plaintiff worked on a temporary basis for a three week period at the Internal Revenue Service.

Plaintiff testified that she is no longer working but has been looking for work since 1993. She attended a 26 week course in medical billing and office procedures in 1992. Thereafter, she was unable to find a job despite sending out in excess of 100 resumes. Since July 1994 to at least the time of the trial in August 1994 plaintiff sought employment through the Massachusetts Rehabilitation Commission. Thus, since the October 8, 1988 accident, plaintiff has held two jobs for a period of three to four weeks each and one part time job for an approximate period of four months.

Plaintiff testified that she continues to experience pain in the left side of her back, neck and, at times, in her leg and arm. She also stated that she has not had a day without pain since the day of the accident.

Plaintiff believes that her restrictions include an inability to lift objects weighing more than five pounds. She also believes that she cannot sit or stand for long periods of time. Dr. Mitchell testified that plaintiff would have difficulty doing tasks which involve lifting more than five pounds, reaching, pulling.[29]

Plaintiff was 40 years old at the time of trial with a life expectancy of approximately 40 years, according to the life tables submitted by plaintiff. She was 34 years old at the time of the accident with a life expectancy of approximately 46 years. She completed her freshman year in high school at the age of 17. She eventually received a general equivalency diploma, commonly known as a GED, in 1991.

## DISCUSSION

The FTCA provides a "limited waiver of sovereign immunity which allows an injured party to sue the United States for torts" to the same extent a private person is liable to the claimant. *Corte–Real v. United States*, 949 F.2d 484, 485 (1st Cir.1991); 28 U.S.C. § 1346(b). "The prerequisite for lia-

---

**28.** This court admitted all three exhibits into the record. The cross examination of Denise Sheehan further clarified the manner in which these photographs came into the possession of defendant which this court has considered relevant to the issue of bias in reaching a decision.

**29.** This court considers Dr. Mitchell's testimony as a medical expert describing the physical capabilities of a patient in light of her medical condition.

bility" under the FTCA is "a 'negligent or wrongful act'" committed by an employee of the United States. *Santiago–Ramirez v. Secretary of the Department of Defense,* 984 F.2d 16, 18 (1st Cir.1993) (quoting 28 U.S.C. § 1346(b)). Where, as here, the plaintiff brings a claim "under section 1346(b) of the FTCA, a court must apply the 'law of the place' where the negligent act occurred." *Soto v. United States,* 11 F.3d 15, 17 (1st Cir.1993); *accord Rosario v. United States,* 824 F.Supp. 268, 276–277 (D.Mass.1993) (substantive law of the state wherein the injury occurred applies both to liability and damages). Massachusetts law therefore applies to plaintiff's claims for personal injuries and property damage.

 As noted previously, defendant stipulates to negligence. In addition to negligence, Massachusetts law requires that the plaintiff establish, "by a preponderance of the evidence, the existence of a causal connection between the defendant's actions (or inactions) and the injury sustained by the plaintiff." *Jorgensen v. Massachusetts Port Authority,* 905 F.2d 515, 524 (1st Cir.1990); *accord Stuart v. Town of Brookline,* 412 Mass. 251, 587 N.E.2d 1384, 1387 (1992) (the plaintiff bears the burden of showing that the injuries are "'causally related to the collision'"); *Gregoire v. O'Leary,* 341 Mass. 727, 170 N.E.2d 320, 321 (1960) (the plaintiff must establish "actual damage attributable to the accident"). The plaintiff must therefore show that the "defendant's conduct was a but-for cause of [her] injury and that [the] defendant's conduct was a 'substantial legal factor' in bringing about the alleged harm to the plaintiff." *Jorgensen v. Massachusetts Port Authority,* 905 F.2d at 524 (citations omitted); *see also Payton v. Abbott Labs,* 780 F.2d 147, 156 (1st Cir.1985) ("the plaintiff must prove it is 'more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm'"); *Embriano v. Grosnick,* 892 F.Supp. 20, 22 n. 5 (D.Mass.1995) (citing *Jorgensen* ).

 In the case at bar and in light of the entire record as previously summarized, this court finds a causal connection between the October 8, 1988 accident and the injury of a cervical strain or sprain suffered by plaintiff.

Dr. Winkler's testimony was particularly persuasive. His expertise and familiarity with plaintiff's medical history was impressive. His demeanor on the witness stand was forthright on cross examination as well as on direct testimony.

Moreover, the record contains support for Dr. Winkler's opinions. The range of motion tests performed by Dr. Popowitz five days after the accident were normal. Results of x-rays taken shortly after the accident were consistent with a muscle spasm. After the accident, plaintiff did not wear the prescribed cervical collar on a constant, steady basis. Neurological examinations of plaintiff proved consistently negative and there is little indication of loss of muscle strength or weakness after the accident.

 Dr. Winkler explained, and this court agrees, that plaintiff's complaints of back and hip pain surfaced too late in time to be causally connected to the October 8, 1988 accident. Dr. Winkler noted that complaints of pain associated with soft tissue injuries ordinarily arise within 36 to 48 hours after the traumatic event. Plaintiff had a full range of motion in her cervical spine on October 13, 1988 and complaints of headaches and pain limited to her neck area. She also had a history of anxiety both before and after the accident.

The testimony of plaintiff's neighbors as well as the medical record of plaintiff's month long stay at the rehabilitation center show that plaintiff could perform physical tasks such as gardening, shoveling snow, mowing the lawn, lifting furniture and weights of at least 15 pounds, bowling, running, walking, bending over and playing with her children. For example, in 1990 plaintiff assisted her neighbors in removing a stump from the ground. Photographs taken in the winter of 1991 to 1992 show plaintiff bending over shoveling snow with apparent full mobility and flexibility.

 Although Dr. Mitchell testified that plaintiff showed signs of muscle tenderness in the muscles throughout her cervical, thoracic and lumbar region and diagnosed her as having multiple strains or sprains in her spine, he also had no recollection of review-

ing Dr. Gutner's notes. His information about plaintiff's anxiety was limited to noting this problem in the medical record from plaintiff's month long stay at the rehabilitation center. In light of the testimony of plaintiff's neighbors and Dr. Winkler and having fully considered the testimony of plaintiff[30] and Dr. Mitchell, this court therefore concludes that plaintiff's cervical strain was temporary and that plaintiff's condition lasted, at best, for a period of six months after the accident. Thus, this court fails to find a causal connection of plaintiff's subsequent reports of pain after April 1989 in her neck, shoulders, back and hip.

 In the event that the plaintiff's injuries are causally related to the defendant's conduct, the plaintiff should be fairly compensated for the injuries sustained. *Rodgers v. Boynton,* 315 Mass. 279, 52 N.E.2d 576, 577 (1943). Compensable damages, both retrospective and prospective, include "pain and suffering, impairment of earning capacity, and disbursements for hospitalization and medical attendance." *Stella v. Curtis,* 348 Mass. 458, 204 N.E.2d 457, 461 (1965). Damages should fairly compensate " 'the injured person for the loss of time, the physical pain and mental suffering, both that undergone in the past and likely to occur in the future.' " *Stuart v. Town of Brookline,* 587 N.E.2d at 1387 (citation omitted); *accord Rodgers v. Boynton,* 52 N.E.2d at 577 (the plaintiff "is entitled to recover for pain and suffering; for reasonable expenses incurred by [her] for medical care ...; for diminution in [her] earning power; and for such pain and suffering and such expenses and diminution of earning capacity as are shown to be reasonably probable to continue in the future").

 With respect to future damages, "recovery depends on [the plaintiff] establishing a 'reasonable probability' that the harm will occur." *Anderson v. W.R. Grace & Co.,* 628 F.Supp. 1219, 1230–1231 (D.Mass. 1986); *accord Rodgers v. Boynton,* 52 N.E.2d at 577. The plaintiff's life expectancy is relevant as to future pain and suffering, *Cuddy v. L and M Equipment Company,* 352 Mass.

458, 225 N.E.2d 904, 907 (1967), as well as to future loss of earning capacity. Finally, the FTCA expressly excludes an award "for interest prior to judgment." 28 U.S.C. § 2674.

 Turning to the issue of past pain and suffering, this court finds that plaintiff is entitled to compensation for the neck pain and headaches she suffered after the accident for a six month period. Such pain and suffering also includes compensation for mental suffering undergone in the past, *Stuart v. Town of Brookline,* 587 N.E.2d at 1387; *Cuddy v. L and M Equipment Company,* 225 N.E.2d at 907, and the aggravation of any pre-existing condition. *See McGrath v. G & P Thread Corporation,* 353 Mass. 60, 228 N.E.2d 450, 452–453 (1967). Having considered plaintiff's testimony and her mental condition from October 1988 through April 1989, this court finds an award of $23,500 to be fair and reasonable compensation for the pain and suffering experienced up to and including April 1989.

 During the period from the October 8, 1988 accident to April 1989, this court further finds that plaintiff incurred $1,425 in medical expenses reasonably necessary for the treatment of her cervical strain. Such medical expenses do not include treatment for physical therapy and/or medical expenses incurred after April 1989 including expenses for plaintiff's 1991 stay at the rehabilitation center.

 With respect to the diminution in plaintiff's earning capacity from October 1988 to April 1989, plaintiff's work history was unsteady. She often held jobs for a period of only a few months and then often at a low wage of no more than ten dollars an hour. Her work history prior to the accident includes jobs such as a receptionist as well as more strenuous jobs such as a waitress, machine operator and nurse's aide. *See generally Solimene v. B. Grauel & Co.,* 399 Mass. 790, 507 N.E.2d 662, 671 n. 16 (1987) (discussing impairment of earning capacity and noting relevance of earnings since the accident). Plaintiff may also recover for "her

---

**30.** Plaintiff's demeanor on cross examination was notably less relaxed than her demeanor on direct examination. Her testimony also contains inconsistencies.

inability, due to the injury, to perform her household duties." *Rodgers v. Boynton,* 52 N.E.2d at 576–578. Plaintiff's injuries to the extent causally related, however, were not fully disabling. In sum, this court therefore finds only a small level of diminution in plaintiff's past earning capacity for a short period of time following the accident yielding an award of $3,700.

Having determined that plaintiff's problem was temporary and lasted no longer than April 1989, the record fails to support an award for future damages.

Turning to the issue of a set off of the amount of damages, defendant withdrew its claim for a set off of the federally funded portion of Medicaid benefits paid to plaintiff. (Docket Entry # 44). Defendant, however, continues to seek a reduction of $2,000 representing the amount of money plaintiff purportedly received under the personal injury protection provision ("PIP") of an automobile insurance policy. (Docket Entry # 37; Docket Entry # 39, ¶ 50). Plaintiff's counsel stipulated that any award given to plaintiff will be deducted by the $2,000 PIP award.[31] (Tr. I, p. 16). The $28,625 total award in Count I is therefore reduced to $26,625.

Count II of the two count complaint requests $2,000 for property damage to plaintiff's motor vehicle. Plaintiff's interrogatory answers (Ex. H), offered into evidence by defendant, *see* F.R.E. 801(d)(2), evidence that property damage to plaintiff's motor vehicle totaled $1,946.04. This court therefore finds that plaintiff is entitled to recover $1,946.04 under Count II.

### CONCLUSION

In accordance with the foregoing discussion, plaintiff is entitled to recover $26,625 in damages from defendant under Count I due to defendant's liability in negligence under the FTCA and $1,946.04 in damages under Count II. A final judgment shall issue in accordance with this opinion.

---

[31] Massachusetts law allows recovery of personal injury protection benefits "in lieu of damages otherwise recoverable by the injured person or persons in tort as a result of an accident occurring in the commonwealth." Mass. Gen. L. ch. 90, § 34M. To the extent the injured person brings an action in tort and recovers a damages award through a settlement or final judgment, the amount of the damages award "shall be reduced to the extent that damages for expenses and loss otherwise recoverable as a personal injury protection benefit are included in any such settlement or judgment." Mass. Gen. L. ch. 90, § 34M.